LEONIDES DÍAZ DÍAZ, peticionaria, *v.* CÁNDIDA CAMPOS DE CÓRDOVA, JEFE DE LA CÁRCEL ESTATAL DE MUJERES, recurrida.

Número 736.

*Sometido:* 11 de diciembre de 1957. *Resuelto:* 30 de junio de 1960.

*Santos P. Amadeo* y *Francisco García Quiñones,* abogados de la peticionaria; *Hon. Secretario de Justicia Hiram R. Cancio,* (*J. B. Fernández Badillo, Ex Secretario de Justicia, Arturo Estrella, Secretario Auxiliar de Justicia* y *Alfredo Archilla Guenard* y *William Fred Santiago, Fiscal* y *Fiscal Auxiliar del Tribunal Supremo,* respectivamente, en el alegato), abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR SERRANO GEYLS emitió la opinión del Tribunal.

La peticionaria fue convicta de violar la Ley núm. 53 de 10 de junio de 1948 (*Leyes,* pág. 171, 33 L.P.R.A., sec. 1471) (¹) y confirmamos la sentencia bajo la autoridad de *Pueblo* v. *Burgos,* 75 D.P.R. 551 (1953); *Pueblo* v. *López de Victoria et al.,* 77 D.P.R. 953 (1955). Más tarde interpuso recurso de *habeas corpus* ante este Tribunal. Expedimos el auto preliminar y autorizamos la libertad bajo fianza.

Se alega por la peticionaria en este recurso que la citada Ley núm. 53 es inconstitucional por estar en conflicto con la legislación federal sobre actos subversivos, debido a que el Congreso de los Estados Unidos, al aprobar la Ley Smith, 18 U.S.C. sec. 2385, tuvo el propósito "de ocupar el campo de castigar la sedición contra todo gobierno establecido en Estados Unidos, incluyendo el gobierno de los Estados Unidos, el gobierno de cualquier estado, territorio, distrito o posesión o el gobierno de cualquier subdivisión política de éstos." (²). En vista del segundo problema que surge de este caso y que pasamos a considerar, es innecesario resolver la cuestión que somete la peticionaria. (³)

---

(¹) Esta ley fue derogada por la Ley núm. 2 de 5 de agosto de 1957 (*Leyes,* pág. 554, 33 L.P.R.A., sec. 1471).

(²) La acusación contra la peticionaria se presentó antes de la vigencia de la Constitución del Estado Libre Asociado de Puerto Rico.

(³) Examínense sobre el problema *Pueblo* v. *Burgos,* supra; *Pennsylvania* v. *Nelson,* 350 U. S. 497 (1956); *Uphaus* v. *Wyman,* 360 U. S. 72 (1959); *Nostrand* v. *Balmer,* 335 P.2d 10, 19 (Wash. 1959); *Constitutional Law-Preemption of State Subversive Activities Law by Federal Law,* 19

El día 19 de julio de 1957, el Gobernador de Puerto Rico le concedió a la peticionaria un indulto absoluto e incondicional—*Cf. Pueblo* v. *Albizu*, 77 D.P.R. 888, 893 (1955)—el cual le fue comunicado por carta el día 24 siguiente. Advertidos de ese hecho, ordenamos a la recurrida enviarnos copia certificada de dicho indulto y concedimos tiempo a ambas partes para someter alegatos complementarios en los que se discutiera la naturaleza del indulto y sus efectos sobre las cuestiones planteadas y la disposición final del caso. Esos documentos constan en autos. Celebramos, además, una vista en la cual se discutió la cuestión.

En su parte esencial el indulto otorgado a la peticionaria provee lo siguiente:

"Yo, LUIS MUÑOZ MARÍN, Gobernador del Estado Libre Asociado de Puerto Rico, en virtud de la autoridad que me confiere la Constitución de Puerto Rico, por la presente indulto a Leonides Díaz Díaz, relevándola de cumplir la sentencia en el caso arriba mencionado por violación a la Ley Núm. 53 y restituyéndole todos sus derechos y prerrogativas bajo la Constitución del Estado Libre Asociado de Puerto Rico."

Nos informa la peticionaria que el indulto no afecta en nada la disposición final del caso porque ella no acepta dicho indulto y sin esa aceptación éste no tiene validez. El Pueblo sostiene, por el contrario, que el indulto ha eliminado la fianza prestada y que en su virtud la peticionaria está completamente libre. Añade que el *habeas corpus* existe para obtener la libertad de una persona que se encuentra bajo custodia ilegal, que tal condición no se cumple en este caso, y que, por consiguiente, el recurso se ha tornado académico (moot). Por las razones que a continuación expresamos, resolvemos que es correcto el criterio de El Pueblo y que procede decretar el archivo del recurso.

La. L. Rev. 864 (1959); Rogge, *State Power Over Sedition, Obscenity and Picketing*, 34 N.Y.U. L. Rev. 817 (1959); Cramton, *The Supreme Court and State Power to Deal with Subversion and Loyalty*, 43 Minn. L. Rev. 1025 (1959); *Federal Preemption of Sedition Field*, 28 Geo. Wash. L. Rev. 457 (1960).

■■■ Aunque los orígenes del auto de *habeas corpus* son un tanto oscuros, por lo menos desde el siglo XVII se le utilizó en Inglaterra como un medio para obtener la libertad de personas puestas en prisión ilegalmente. (⁴)   Desde entonces hasta nuestros días, tanto por decreto de ley como por práctica judicial invariable, lo mismo en Inglaterra que en los Estados Unidos y Puerto Rico, se ha considerado indispensable que exista una restricción ilegal de la libertad de la persona para que pueda expedirse un auto de *habeas corpus*. (⁵)

En *McNally* v. *Hill, Warden*, 293 U. S. 131 (1934) el Tribunal Supremo federal, luego de un examen riguroso de los orígenes del auto en Inglaterra y de su desarrollo en los Estados Unidos, expresó lo siguiente: "No existe autoridad en la ley o en el recurso que permita su uso para invocar la determinación judicial de cuestiones que no han de afectar la legalidad de la custodia y detención, y no hemos hallado indicación alguna de tal uso en los comentarios sobre el derecho común inglés.   Una búsqueda diligente de las autoridades inglesas y de los digestos anteriores a 1789, no arroja ningún caso en el cual se hubiera solicitado o utilizado el auto, antes o después de la convicción, como un medio para obtener un dictamen judicial sobre una cuestión, que aun cuando se resolviese en favor del peticionario, no produciría su inmediata libertad.

---

(⁴) *The Freedom Writ-The Expanding Use of Federal Habeas Corpus*, 61 Harv. L. Rev. 657 (1948) ; Amadeo, *El Habeas Corpus en Puerto Rico* (1948) págs. 5–8; Church, *Habeas Corpus* (1893) págs. 2–33; Fellman, *The Defendant's Rights* (1958) págs. 64–67.

(⁵) En California el *habeas corpus* se utiliza no sólo para obtener un remedio contra una detención ilegal sino también para librar al preso de condiciones ilegales de prisión. *Ex parte Collins*, 97 Pac. 188, 190 (1908) ; *Ex parte Byrnes*, 161 P.2d 376, 377 (1945) ; *Application of Chessman*, 279 P.2d 24, 27 (1955) ; *Application of Gonsalves*, 311 P.2d 483, 486 (1957) ; *Application of Rye*, 313 P.2d 914, 915 (1957) ; *Habeas Corpus on Ground of Unlawful Treatment of Prisoners Lawfully in Custody*, 155 A.L.R. 145 (1945).   En cuanto a la jurisdicción federal, examínese *Application of Hodge*, 262 F.2d 778, 780 (9 Cir. 1958) ; *Coffin* v. *Reichard*, 143 F.2d 443 (6 Cir. 1944) ; *Coffin* v. *Reichard*, 148 F.2d 278 (6 Cir. 1945) ; *Williams* v. *Steele*, 194 F.2d 32, 917 (8 Cir. 1952) cert. denegado, 344 U. S. 822 (1955). No expresamos criterio alguno sobre esa cuestión por no estar planteada en el presente recurso.

"Tal uso del auto en las cortes federales no está sostenido por la historia ni por lenguaje alguno en las leyes que pueda señalar hacia un propósito de ampliar su función tradicional . . . Sin restricción de la libertad no puede expedirse el auto. Igualmente, sin una restricción que sea ilegal, no puede utilizarse el recurso." (Págs. 137–138.) Y añadió: "Cada vez que se ha planteado el problema, este Tribunal uniformemente se ha negado a revisar, mediante *habeas corpus*, cuestiones que no afectan la legalidad de la detención." (Pág. 139.) Más tarde, en *Eagles* v. *Samuels*, 329 U. S. 304, 307 (1946) luego de citar parte del lenguaje arriba transcrito, el Tribunal completó la doctrina afirmando enfáticamente: "Si la custodia o restricción de la libertad finalizan sin el uso del recurso, el caso ha terminado." Y muy recientemente, en *Parker* v. *Ellis*, 28 L. W. 4321 (16 de mayo de 1960) se afirmó que "es un requisito de la jurisdicción de este Tribunal para dictaminar sobre una solicitud de *habeas corpus* que el peticionario esté bajo custodia cuando esa jurisdicción pueda hacerse efectiva." Véase, además, *Heflin* v. *United States*, 358 U. S. 415, 421 (1959).

Los principios fundamentales expuestos en las citadas sentencias han sido aplicados por el Tribunal Supremo federal en diversas situaciones. Por estos motivos se ha negado el auto cuando la restricción es puramente moral—*Wales* v. *Whitney*, 114 U. S. 564 (1885); el encarcelamiento es voluntario—*Baker* v. *Grice*, 169 U. S. 284 (1898); la prisión habría terminado antes de que pudiera completarse el procedimiento inicial—*Ex parte Báez*, 177 U. S. 378 (1900); el peticionario puede obtener su libertad por otros medios—*In re Lincoln*, 202 U. S. 178 (1906); el peticionario está en libertad bajo fianza en la causa criminal—*Stallings* v. *Splain*, 253 U. S. 339 (1920); *Johnson* v. *Hoy*, 227 U. S. 245 (1913); no está cumpliendo aún la sentencia que sostiene es ilegal—*McNally* v. *Hill*, supra; se encuentra en libertad bajo palabra—*Weber* v. *Squier, Warden*, 315 U. S. 810 (1942); ha cumplido la sentencia en su totalidad, *Parker* v. *Ellis*, supra; o cuando por

alguna razón el peticionario no se halla bajo la custodia del recurrido—*United States ex rel Lynn* v. *Dower,* 322 U. S. 756 (1944); *Kesling* v. *Humphrey, Warden,* 322 U. S. 759 (1944); *Zimmerman* v. *Walker,* 319 U. S. 744 (1943).([6])

En nuestro país, la ley de habeas corpus concede el derecho de solicitar el auto a "cualquier persona que por cualquier pretexto sea encarcelada o ilegalmente privada de su libertad." (34 L.P.R.A., sec. 1741.) La solicitud deberá especificar "que la persona a cuyo favor se solicita el auto está encarcelada y privada de su libertad, el funcionario o persona que le privó de la libertad, y el sitio o lugar donde se encuentra . . ." (Sec. 1742.) "El auto ha de dirigirse a la persona o autoridad que tenga detenido al presunto culpable a cuyo favor se ha hecho la solicitud, ordenándole, que presente a la persona detenida o arrestada ante el tribunal o juez donde haya de tener lugar la vista del auto, en la hora que se determina en el mismo" (Sec. 1745). La persona contra quien se dicte el auto deberá contestar declarando "si tiene o no bajo su custodia, detenida, o bajo su poder a la persona a cuyo favor se dicte el auto", la causa o autorización de la prisión, o si ha

---

([6]) Situaciones parecidas han surgido en los tribunales federales inferiores. Examínese entre otros, *Darr* v. *Burford,* 172 F.2d 668 (10 Cir. 1949) conf. en 339 U. S. 200 (1950); *Van Meter* v. *Sanford,* 99 F.2d 511 (5 Cir. 1938); *López* v. *Swope,* 205 F.2d 8 (9 Cir. 1953); *Whitte* v. *Ferber,* 219 F.2d 113 (3 Cir. 1955); *United States ex rel Toran* v. *Thompson,* 192 F.2d 807 (2 Cir. 1951); *United States ex rel St. John* v. *Cummings,* 233 F.2d 187 (2 Cir. 1956); *Reger* v. *Hudspeth,* 103 F.2d 825 (10 Cir. 1939); *Ex parte Beach,* 259 Fed. 956 (D. C. Cal. 1919); *Jones* v. *Biddle,* 131 F.2d 853 (8 Cir. 1942); *Kelly* v. *Aderhold,* 112 F.2d 118 (10 Cir. 1940); *Lowrey* v. *Clark,* 82 F. Supp. 1009 (D. C. Pa. 1948); *In re Rowland,* 85 F. Supp. 550 (D. C. Ark. 1949); 15 *Cyclopedia of Federal Procedure* (3ra ed. 1953) secs. 86.28–86.33. En los estados prevalece la misma situación. Véanse como ejemplos, *State* v. *Huffman,* 297 P.2d 831 (Or. 1956); *Hyde* v. *Nelson,* 229 S. W. 200 (Mo. 1921); *State* v. *Cohen,* 201 Pac. 1027 (Nev. 1921); *Ex parte Wilken,* 115 N. W. 1075 (S. D. 1908); *Hendershott* v. *Young,* 120 A.2d 915 (Md. 1956); *Ex parte Rubly,* 261 S.W.2d 4 (Ark. 1953); *When criminal or contempt case becomes moot so as to preclude review by higher court,* 87 L. ed. 1201 (1943); *Habeas Corpus—Nature and Extent of Restraint Necessary to Warrant Issuance of Writ,* 42 Col. L. Rev. 1214 (1942); *Parolee's Right to Habeas Corpus,* 148 A.L.R. 1243 (1944); *Fellman, ob. cit.* 68–69; *Right of one at large on bail to writ of habeas corpus,* 14 A.L.R. 344 (1921).

transferido la custodia a otro. (Sec. 1748.) La persona "habrá de traer el preso bajo su custodia de acuerdo con lo ordenado en el auto . . ." (Sec. 1749.) "Si de las pruebas no resulta causa legal para la prisión o detención, el tribunal o juez ordenará la excarcelación o levantará la detención de la persona." (Sec. 1753.) De lo contrario, "ordenará nuevamente la encarcelación o dispondrá que continúe la detención en el lugar donde se encontraba, siempre que la persona que lo tenía bajo su custodia o detención, tenga derecho a ello legalmente." (Sec. 1759.)

Surge claramente de las citadas disposiciones, y de las demás que componen nuestra ley de *habeas corpus*, que el recurso desempeña en Puerto Rico el mismo papel que históricamente le fue asignado en Inglaterra y los Estados Unidos: proteger la libertad personal contra detenciones ilegales. Tiene, por consiguiente, que existir una custodia o detención ilegal y una persona que tenga detenido ilegalmente a aquél en cuyo favor se solicita el auto. Nuestra jurisprudencia invariablemente ha exigido el cumplimiento de esos requisitos indispensables. *Ex parte Soldini*, 4 D.P.R. 168, 175 (1903); *Ex parte Bird*, 5 D.P.R. 247, 273 (1904); *Ex parte Cintrón*, 5 D.P.R. 90, 93 (1904); *Ex parte Díaz*, 7 D.P.R. 153, 179 (1904); *Ex parte Dessús*, 11 D.P.R. 386, 387 (1906); *Rivera* v. *El Pueblo*, 26 D.P.R. 186, 187 (1918); *López* v. *Corte*, 40 D.P.R. 499, 501 (1930); *Amadeo, ob. cit.* págs. 18–20.

El problema específico que ahora nos concierne resolver—el efecto de un perdón incondicional sobre un recurso de *habeas corpus*—nunca ha sido discutido por este Tribunal. Hay, sin embargo, varios precedentes federales y estatales. En *Hudspeth* v. *Tornello*, 128 F.2d 172 (1942) la Corte de Circuito revocó una orden de una Corte de Distrito federal dictada en un procedimiento de *habeas corpus* y por la cual se decretaba la libertad del peticionario. Este solicitó del Tribunal Supremo federal expidiera un auto de *certiorari* para revisar la mencionada sentencia. En *Tornello* v. *Hudspeth*, 318 U. S. 792 (1943) el Tribunal resolvió lo siguiente:

"Se deniega la petición de un auto de *certiorari* dirigido a la Corte de Circuito de Apelaciones para el Décimo Circuito por el fundamento de que el caso es académico (moot), habiéndose demostrado que el peticionario ha sido perdonado por el Presidente y que ya no se encuentra bajo la custodia del recurrido. *Weber* v. *Squier*, 315 U. S. 810." La sentencia no ofrece ningún otro detalle sobre las circunstancias del caso. (⁷)

En la jurisprudencia de los tribunales federales inferiores existe un precedente que analiza ampliamente el problema, ante una situación de hechos casi idéntica a la que hoy confrontamos. (⁸)    En *In re Callicot*, 8 Blatchf. 89, 4 Fed. Cas. 1075 (Cir. Ct. N. Y., 1870)—citado con aprobación en *Ex parte Báez*, 177 U. S. 378, 389 (1900)—el peticionario presentó una solicitud de *habeas corpus* alegando que su encarcelamiento era ilegal porque la sentencia en su contra había sido dictada al amparo de una ley que a la sazón estaba derogada. En la vista del recurso, el fiscal federal probó que unos días antes el Presidente de los Estados Unidos había concedido un perdón absoluto e incondicional al peticionario y que dicho perdón le había sido comunicado a éste.    Al resolver la cuestión expresó el Juez Blatchford: "Hay prueba de que el peticionario ha sido perdonado.    La petición en que se funda la presente solicitud tiene fecha y fue jurada en el pasado mes de mayo.    El perdón es absoluto e incondicional.    ¿Cómo, pues, puede una orden dictada por mí conceder mayor libertad al peticionario que la que hoy tiene?    Si, en mayo, él estaba bajo restricción, hoy está tan libre para ir y venir donde él

---

(⁷) Aunque conocemos las repetidas advertencias del Tribunal Supremo federal en el sentido de que una denegatoria de *certiorari* no crea jurisprudencia, entendemos que tal doctrina no se aplica cuando el Tribunal expresamente basa su denegatoria en un fundamento jurisdiccional. Véanse *Parker* v. *Ellis*, supra; *Factor* v. *Fox*, 175 F.2d 626, 629 (6 Cir. 1949).

(⁸) No hemos hallado, ni se nos ha citado, sentencia alguna de los estados que analice el problema específico que estamos discutiendo.    Existen algunas sentencias que declaran académico (moot) el recurso por haberse otorgado un perdón al peticionario, pero no discuten la cuestión.    *Ex parte Davis*, 146 Pac. 1085 (Okl. 1915); *Ex parte Whitley*, 233 Pac. 769 (Okl. 1925); *Ex parte Ellard*, 43 S.W.2d 931 (Tex. 1931).

desee como el abogado que hizo la solicitud; y, por lo tanto, a menos que el auto de *habeas corpus* pueda utilizarse y considerarse por mí como un auto de error para revisar, y en efecto, revocar la sentencia, no existe razón para expedirlo . . . . . . . . . Si yo autorizara el auto, la contestación sería, que él ya no se encuentra en la penitenciaría, o que él está allí porque de su propia voluntad desea estar, y no porque su libertad esté restringida. Si él acudiese voluntariamente ante mí, lo único que podría yo decirle es que él está completamente libre para irse. Por este motivo, la moción solicita algo que es innecesario dentro de los propósitos para los cuales se utiliza el auto de *habeas corpus*. La ley provee y declara que el auto debe concederse a personas que estén en prisión. La restricción de la libertad es la verdadera base para instituir una pesquisa sobre la causa de la detención. Si constara que, desde el perdón y a pesar del perdón, el alcaide de la penitenciaría lo retiene bajo alguna restricción, se presentaría un caso para ser investigado; pero los documentos que tengo ante mí no demuestran que ése sea el caso, y entiendo que tal cosa ni tan siquiera se sugiere en favor del peticionario." (Págs. 1077–1078.)

El tribunal consideró entonces los efectos que podría tener sobre el recurso el hecho de que el peticionario no hubiere aceptado el perdón. Y añadió: "Todo lo anterior podría concederse y suponemos que un prisionero puede aceptar o rehusar un perdón incondicional, si así lo deseare. No negamos que cuando se hubiere solicitado un auto de error contra una sentencia no se puede prohibir al prisionero, por medio de un perdón, que lleve hacia adelante el recurso con el fin de lograr una revocación del error. Él puede preferir que la sentencia sea anulada o revocada; pero esa no es la función del auto de *habeas corpus* en tal caso, según lo demuestran los precedentes a los cuales me he referido. Si él prefiere rehusar el perdón, no está en condiciones de decir que ése no es otra cosa que su acto voluntario, no importa cuál sea el motivo . . ." (Pág. 1078.)

Nos parece que el razonamiento contenido en *In re Calli-cott* se ajusta perfectamente a los principios fundamentales que históricamente han regido el auto de *habeas corpus* y a las exigencias particulares de nuestra ley y nuestra jurisprudencia. Por esas razones debemos adoptarlo en este recurso. Hay, no obstante, una leve diferencia entre las dos situaciones. Contrario a lo sucedido en *Callicott*, la peticionaria en el presente caso se hallaba en libertad bajo fianza al momento en que las autoridades del penal le comunicaron que el Gobernador le había otorgado un perdón incondicional. Esa fianza le fue autorizada por este Tribunal dentro del propio recurso de *habeas corpus*. (⁹)

Nos parece evidente que la fianza así prestada no puede tener efecto alguno sobre el problema planteado. (¹⁰) Los funcionarios a cargo de la persona de la peticionaria tenían la obligación de dar fin al estado de custodia tan pronto recibieran la orden ejecutiva, a menos que consideraran que el perdón era nulo y decidieran resistir la orden. *Cf. Jamison* v. *Flanner*, 228 Pac. 82, 84 (Ka. 1924); *Weigel* v. *McCloskey*, 166 S. W. 944, 946 (Ark. 1914); *In re Moore*, 31 Pac. 980; (Wy. 1893); *Judicial investigation of pardon by governor*, 30 A.L.R. 238 (1924). Tal situación, desde luego, no está ante nosotros. No hay duda de que las autoridades ejecutivas dieron por terminada la custodia de la peticionaria,

---

(⁹) Es, desde luego, obvio que una fianza prestada dentro del propio recurso de *habeas corpus* no puede utilizarse como razón para anular el auto, alegando que el peticionario se halla "en libertad". En tales circunstancias, se suspende la custodia temporalmente como parte del procedimiento mismo de *habeas corpus*. Si el auto finalmente se expide, la libertad del preso es completa e incondicional. Si se deniega, la custodia puede recomenzarse legalmente. Examínense *Eagles* v. *Samuels*, supra, y casos en él citados.

(¹⁰) En *Ex parte Whitley*, 233 Pac. 769 (Okl. 1925) sucedió exactamente lo mismo que en el presente caso—el peticionario recibió un perdón completo e incondicional luego de estar en libertad bajo una fianza autorizada por el tribunal de apelaciones, en un procedimiento de *habeas corpus* instituido originalmente ante dicho tribunal y ya sometido para decisión final. Se ordenó la desestimación (dismissal) de la solicitud por motivo del perdón, pero el tribunal no discutió el problema. *Cf. Stephens* v. *State*, 239 Pac. 450 (Okl. 1925).

como cuestión de hecho, desde el momento en que a ella se le comunicó el perdón. De esta manera, la suspensión temporal de la custodia ocasionada por la fianza, se convirtió en definitiva por acción de los funcionarios ejecutivos. En realidad, la peticionaria estaba tan libre desde ese instante como lo hubiese estado si, siendo una prisionera, se le hubiese puesto en la calle al momento de comunicársele el perdón. No hay absolutamente nada en el expediente que pruebe, o tan siquiera sugiera, que las autoridades ejecutivas hubiesen detenido a la peticionaria si hubiésemos ordenado la cancelación de la fianza en cualquier fecha posterior a la del perdón, ([11]) o que habrán de hacerlo si como resultado de este caso ordenamos dicha cancelación. ([12]) La única manera por la cual la peticionaria hallaría restringida su libertad sería la de solicitar y obtener que se le encarcelara de nuevo. Pero aun en el absurdo de que los funcionarios del penal accedieran, no procedería el *habeas corpus* porque la restricción sería enteramente voluntaria. *Cf. Hendershott* v. *Young,* supra; *In re Callicott,* supra.

En vista de todo lo anteriormente expresado, resolvemos que por haber cesado la custodia con motivo del perdón absoluto e incondicional que se le otorgó a la peticionaria, no existe restricción alguna de su libertad y que, en consecuencia, procede anular el auto expedido por haberse tornado académico (moot) el recurso. *Parker* v. *Ellis,* supra. Este fallo en modo alguno debe interpretarse como un abandono de nuestra reiterada actitud de salvar los tecnicismos de procedimiento para resolver los asuntos en su fondo. El vicio procesal que hemos considerado afecta la esencia misma del recurso de

---

([11]) Por el contrario, la Directora de la Cárcel Estatal de Mujeres en su carta a la peticionaria enviándole el mandato del Gobernador, dijo lo siguiente: "Reciba usted mi felicitación y que Dios le ilumine para que haga usted buen uso del privilegio que le ha sido concedido." Y el representante legal de la Directora ante este Tribunal, repetidamente nos dice que la peticionaria "goza de completa libertad" en virtud del indulto otorgádole.

([12]) Si tal cosa sucediera, la peticionaria tendría claro derecho a solicitar de este Tribunal la expedición de un auto de *habeas corpus.*

*habeas corpus* y no podemos ignorarlo sin a la vez desnaturalizar completamente el remedio. El *habeas corpus*, repetimos, por diseño histórico y conformación jurídica funciona exclusivamente para libertar a personas que se hallen bajo una custodia ilegal e involuntaria y nunca para cuestionar, en ausencia de esos requisitos, la validez de una ley. Si la custodia cesa definitivamente por decisión de aquél que la ejerce, cesa también el poder judicial de determinar sus causas, porque el *habeas corpus* existe para investigar la validez de la detención y no la validez de la libertad.

Por las razones expuestas, no es posible resolver la cuestión constitucional planteada por la peticionaria en este procedimiento, o si el perdón incondicional otorgádole tenía o no que ser aceptado por ella. La peticionaria tendrá la oportunidad de hacer esos planteamientos ante el tribunal sentenciador si presenta una moción para anular la sentencia. (¹³)

*Se dictará sentencia anulando el auto expedido por ser académico el recurso y ordenando la cancelación de la fianza.*

---

Opinión concurrente del Juez Presidente Sr. Negrón Fernández.

Estoy conforme con que se archive, por académico, el recurso. No creo, sin embargo, que "la restricción de la libertad de la peticionaria por parte de las autoridades ejecutivas terminó como cuestión de hecho en el momento en que a ella se le comunicó el perdón." En ese momento, a mi juicio, no se produjo un nuevo estado de hecho, sino de derecho, por

---

(¹³) En *Pueblo* v. *Cruzado*, 74 D.P.R. 934, 940 (1953) resolvimos que "Si una sentencia lesiona los derechos constitucionales o fundamentales del acusado, o si se ha dictado sin jurisdicción, la validez de esa sentencia puede ser atacada directamente mediante moción, aun si la moción no participa directamente de la naturaleza de un auto de *coram nobis*." Y añadimos: "Tratándose de cuestiones constitucionales de carácter fundamental, el hecho de que las apelaciones contra las sentencias hubiesen sido desestimadas por este Tribunal, por abandono, no debe ser obstáculo o impedimento a la consideración de tal moción." (Pág. 941.) Véanse, además, *Pueblo* v. *Gerena*, 72 D.P.R. 222 (1951); *Pueblo* v. *Soto*, 72 D.P.R. 412 (1951); *Román* v. *Jefe Penitenciaría Estatal*, 78 D.P.R. 767 (1955).

efecto del perdón, ya que la peticionaria estaba en libertad provisional desde que fue excarcelada al prestar la fianza que en el ejercicio de nuestro poder y sujeta a nuestra determinación final, le fijó este Tribunal dentro del procedimiento de hábeas corpus por ella instado.

La custodia de la peticionaria quedó sustituida, bajo nuestra autoridad, por un estado de libertad provisional que puso fin a su custodia física por parte de las autoridades del penal mientras se investigaba el derecho que invocaba a su plena libertad. Esa libertad provisional normalmente hubiera subsistido hasta que la fianza prestada hubiere sido cancelada por este Tribunal y ordenada nuevamente su encarcelación, si no prosperaba el derecho que reclamaba a su libertad definitiva. Pero habiendo mediado un perdón absoluto e incondicional, que borró para siempre la convicción del delito imputado, *Emanuelli* v. *Tribunal de Distrito*, 74 D.P.R. 541; Cf. *Pueblo* v. *Albizu*, 77 D.P.R. 888, y que no tenía, por tanto, que ser aceptado por la peticionaria para que el mismo causara estado de libertad, de pleno derecho, el presente recurso se convirtió en académico, por razón del perdón, ya que el hecho de la libertad que disfrutaba provisionalmente no quedó alterado por éste. Lo que quedó alterado fue la naturaleza del derecho en que se fundaba el hecho de su libertad, y el carácter de ésta.

El perdón tuvo el efecto jurídico de convertir en definitivo el estado de libertad disfrutado provisionalmente por la peticionaria en virtud de la fianza prestada dentro del procedimiento de hábeas corpus, y como consecuencia de ello, dicha fianza dejó de tener existencia jurídica por haber sido sustituido el derecho a la libertad provisional bajo la misma, por el mejor derecho a la libertad plena bajo el perdón concedido. En ese sentido este Tribunal no tendría que ordenar la cancelación de la fianza por ser ésta ya inexistente en derecho.

---

Opinión concurrente del Juez Asociado Sr. Santana Becerra.

Convengo en que no es necesario resolver el recurso de hábeas corpus en sus méritos. Llego a esa conclusión por las

razones que a continuación expongo para lo cual me es preciso señalar ciertos hechos.

La peticionaria Leonides Díaz Díaz levantó en este recurso de hábeas corpus la nulidad e inexistencia legal de la Ley núm. 53 de 10 de junio de 1948—33 L.P.R.A., sec. 1471,— bajo la cual fue condenada a reclusión de dos a diez años de presidio. En 21 de mayo de 1956 expedimos el auto. El 12 de junio de 1956 se celebró la vista y las partes fueron oídas. El 10 de julio de 1957 la peticionaria solicitó que se le fijara fianza para permanecer en libertad mientras se resolvía el caso y oído el fiscal, quien se opuso por escrito, en 18 de julio de 1957 se expidió mandamiento poniendo a la peticionaria en libertad provisional mediante la prestación de una fianza, hasta tanto se resolviera el caso en los méritos. La fianza según fue aprobada por el Tribunal respondía, por toda obligación, de que la peticionaria comparecería ante el Tribunal y que en todo tiempo acataría las órdenes y providencias legales que se dictaren y comparecería al pronunciamiento de la sentencia y se sometería al cumplimiento de la misma, ya fuere dictada en primera instancia o en grado de apelación. Aparte de la obligación antes expresada, la peticionaria, como cuestión de hecho, quedó provisionalmente en el goce y disfrute de plena libertad sin restricción otra alguna. El 23 de diciembre de 1957 el Tribunal, por propia iniciativa, dictó la siguiente resolución:

"Se ordena a la parte demandada el envío al Secretario de este Tribunal de copia certificada del indulto concedido a la peticionaria por el Honorable Gobernador de Puerto Rico. Se le concede a las partes un término de treinta días a partir de hoy para radicar alegatos complementarios en que se discuta la naturaleza del indulto y los efectos, si algunos, de dicho indulto sobre las cuestiones planteadas y la disposición final de este caso."

En cumplimiento de la anterior resolución ambas partes expusieron sus respectivas posiciones. La peticionaria informó el hecho de haber sido notificada a través de dos comunicaciones de un indulto concedídole por el Gobernador, Hon.

Luis Muñoz Marín, en 19 de julio de 1957; la primera dirigida a la Escuela Industrial de Mujeres por conducto de la Directora, fechada en 24 de julio de 1957 y la segunda, fechada en 29 de julio, dirigida por la Directora a la peticionaria al Barrio Santana de Arecibo. No obstante, sostiene ante nos que el indulto no afecta legalmente las cuestiones planteadas ni la disposición final del recurso de hábeas corpus porque dicho indulto no tiene validez alguna sin su aceptación, y por lo tanto no puede convertir en académico el caso. Nos dice entonces que no acepta el indulto porque ello implicaría que fue culpable del delito por el cual se le sentenció, culpabilidad que nunca aceptó ni ahora aceptaría, razón por la cual la no aceptación del indulto constituye para ella un problema de conciencia y de dignidad humana. Que de obligársele a aceptarlo, convirtiéndole en académico el recurso de hábeas corpus, ello constituiría la violación de derechos constitucionales garantizados por la Constitución del Estado Libre Asociado, entre ellos una violación a la libertad de pensamiento y de conciencia. Finalmente expone que el indulto no protege sus derechos ya que éste no borra el antecedente penal del delito por el cual fue sentenciada, lo que ocurriría si se anula la sentencia mediante el hábeas corpus pendiente.

Por otra parte, el Fiscal asume la posición, citando del caso de *Pueblo* v. *Albizu,* 77 D.P.R. 888 y a *Emanuelli* v. *Tribunal,* 74 D.P.R. 541, que el indulto borra para siempre la convicción del delito cometido quedando de ahí en adelante el indultado tan limpio de ella como si nunca hubiera sido convicto; que la acusada goza ahora de plena libertad en virtud del indulto otorgado en forma total e incondicional; que el efecto del indulto es *eliminar la causa* y con ella cualquier fianza prestada por la peticionaria, y que si la peticionaria se ampara en dicho indulto para disfrutar de la libertad que el mismo le concede *lo ha aceptado*, pues siendo legal su encarcelación no procede alegar coacción por este motivo, al aceptar el mismo. Arguye finalmente que estando libre la peticionaria y no estando *restringida* de su libertad, no hay utilidad

práctica alguna en la solución del recurso. El Fiscal nos cita autoridades nuestras y de otras cortes,—entre ellas el caso de *In re Callicot*, 4 Fed. Cases 1075, (1870), en que se trataba de un recurso de hábeas corpus en donde medió un indulto,— sobre el histórico principio de que no procede el recurso cuando la persona no se halla real y efectivamente restringida de su libertad; y como se dijo en *López* v. *Corte*, 40 D.P.R. 499, que histórica y esencialmente el hábeas corpus es para obtener la libertad de una persona *que está bajo custodia.*

La cuestión surgida en este caso dado los hechos del mismo, no se circunscribe al principio clásico conocido de que no procede expedir o resolver un recurso de hábeas corpus cuando la persona no tiene restricción alguna de su libertad, salvo en los casos, por supuesto, en que se le pone bajo fianza. Una vez que tomamos a nuestro cargo el derecho de la peticionaria a su libertad y expedimos el auto mientras se hallaba bajo custodia, decretando más tarde que quedara libre hasta que hiciéramos la determinación de su derecho, desapareció toda consideración en cuanto a la necesidad de una restricción física para que proceda resolverle el recurso. El problema que se crea en torno al principio antes expuesto que no ocurre en nuestras decisiones anteriores ni en las citas que somete el Fiscal, inclusive el caso de *Callicot*, supra, (1) es que al considerarse aquí si procede o no resolver el caso en sus méritos por la ausencia de una restricción de la libertad no es posible determinar en cuanto a los hechos concierne, si la peticionaria está libre de restricción por razón del mandamiento de este Tribunal de 18 de julio de 1957 y la fianza, o si lo está porque disfruta del indulto que se le otorgó. El Fiscal parece asumir que la peticionaria se ampara en el indulto para disfrutar de su libertad y lo ha aceptado. Pero el récord no justifica tal deducción no sólo por la posición de la peticionaria rechazando el mismo sino porque tampoco revela hechos que permitan

---

(1) De acuerdo con los hechos de este caso se trataba de la etapa inicial de si procedía o no expedir un auto de hábeas corpus para una persona ya indultada que, según dijo el Juez, si permanecía en prisión lo sería por su propia voluntad y estaba en libertad de partir cuándo y adonde quisiera.

inferir una aceptación implícita. Por otra parte, la concesión del indulto no produjo *de hecho* la ausencia de restricción en que se encuentra la peticionaria. En las anteriores circunstancias la controversia sobre si este caso se nos ha convertido o no en académico nos sitúa frente a un problema escueto de derecho,—y no de hecho a base del otorgamiento material del perdón,—que se resuelve por el efecto legal del perdón sobre el estado de libertad en que se hallaba la peticionaria al serle notificado. Por ese efecto legal el estado de libertad de hecho únicamente de la peticionaria, provisional y sujeto a terminación, se convirtió en un estado de libertad de derecho, permanente e irrevocable. No habría razón para fallar el recurso en lo que a la libertad final de la peticionaria concierne, que es lo único pertinente en procedimientos de esta naturaleza, y una sentencia del Tribunal no podría concederle una libertad más permanente o más absoluta.

No termina aquí el problema, ya que la peticionaria ha puesto en controversia en este procedimiento la validez del perdón como cuestión de derecho por falta del requisito de la aceptación, y le niega cualquier efecto legal. Sin lugar a dudas su planteamiento descansa en autoridades de peso. Véanse por ejemplo: *United States* v. *Wilson*, 8 L. ed. 640, 7 Peters, 32 U. S. 149; *Burdick* v. *United States*, 236 U. S. 79; *Ex parte Prout*, (Idaho) 86 Pac. 275, 277; *Weigel* v. *McCloskey*, (Ark.) 166 S. W. 944; *Chapman* v. *Scott*, 10 F.2d 156; 10 F.2d 690 (C. A. 2), cert. den. 270 U. S. 657; *Carpenter* v. *Lord*, (Oregon) 171 Pac. 577, 580; *People* v. *Frost*, (N. Y.) 117 N.Y.S. 524, 528; *Anotación*, 52 A.L.R. 835; Fordham L. Rev., Vol. 6 pág. 255–269; 26 Colum. L. Rev. 624; Cf. *Biddle* v. *Perovich*, 274 U. S. 480.

No intento extenderme en una discusión dilatada de la cuestión que se suscita, por cierto muy discutida. Este Tribunal ha hecho pronunciamientos sobre los efectos de un indulto incondicional y absoluto para la persona indultada que a mi juicio hacen innecesaria una tal discusión. El primer pronunciamiento sobre el requisito de la aceptación del perdón

ejecutivo bajo la Constitución federal nos lo ofrece en 1833 el Juez Presidente Marshall en el caso de *United States* v. *Wilson*, supra. Quizás sea conveniente señalar a los fines y en medio de qué planteamientos legales el pronunciamiento tuvo lugar, si se considera que en el mismo ha descansado toda una línea de decisiones. Según los hechos Wilson fue acusado de varios delitos a los cuales hizo alegación de inocencia y convicto en uno de ellos se le sentenció a muerte. Luego retiró en todos la alegación de inocencia y alegó ser culpable. Pendiente la ejecución el Presidente Jackson le concedió un perdón del delito por el cual se le sentenció a morir, con la mención expresa de que no era extensivo a ninguna otra sentencia que se le impusiera en cualquier otro caso pendiente en que estuviera acusado. Meses después el Fiscal pidió que dictaran sentencia a Wilson pero la corte quiso indagar sobre cierto perdón que entendía se le había concedido después de haber sido convicto de esta acusación. El Fiscal levantó el punto de que el acusado no podía beneficiarse del perdón sin haber traído el mismo al conocimiento judicial mediante alegación, moción o de cualquier otra manera. Los jueces se dividieron sobre el particular y certificaron el asunto al Tribunal Supremo. Dijo el Juez Marshall: [7 Peters 159]

"Si el [perdón] podía probarse sin ser alegado es sustancialmente la misma cuestión que la presentada en el segundo punto, que es, 'que el prisionero no podía, bajo esta convicción, obtener ventaja del perdón sin traer el mismo judicialmente a la corte mediante alegación, moción o de otra manera.'

"La Constitución concede al Presidente, en términos generales, 'el poder de conceder suspensiones de sentencias y perdones por delitos contra los Estados Unidos.'

"Conforme este poder se había ejercido desde tiempo inmemorial por el ejecutivo de esa nación cuyo idioma es nuestro idioma, y con cuyas instituciones judiciales las nuestras guardan estrecha semejanza; nosotros adoptamos sus principios respecto a la acción y efecto de un perdón, y buscamos en sus libros las normas sobre la manera en que debe ser usado por la persona que desea valerse del mismo.

"Un perdón es un acto de gracia, procedente del poder encargado de hacer cumplir las leyes, que exime al individuo a quien se le otorga del castigo que la ley impone por un crimen que él ha cometido. Es el acto particular, aunque oficial, del primer magistrado, comunicado al individuo para cuyo beneficio se ha intentado, y no notificado oficialmente a la corte. Es parte constitutiva del sistema judicial el que el juez ve sólo con ojos judiciales, que no sabe de nada, respecto a cualquier caso en particular, de lo cual no es judicialmente informado. Un documento privado que no se le comunica, cualquiera que pueda ser su naturaleza, sea un perdón o descargo, es totalmente desconocido y no puede actuarse sobre él. La relajación que se introduciría en los procedimientos judiciales resultaría fatal a los grandes principios de justicia, si el juez pudiera tomar conocimiento sobre hechos no traídos en forma regular a la causa. Tal proceder, en casos corrientes, subvertiría los mejores principios establecidos, y trastornaría aquellas reglas asentadas por la sabiduría de los tiempos.

"¿Existe algo peculiar en un perdón que obliga a distinguirlo en este respecto de otros hechos?

"No conocemos principio legal alguno que sostenga tal distinción.

"*Un perdón es un instrumento* [deed], *para la validez del cual la entrega es indispensable, y la entrega no está completa sin aceptación.* Puede a la sazón ser rechazado por la persona a quien se le ofrece; y si fuere rechazado, no hemos descubierto poder en una corte para imponérselo." (Énfasis adicionado.)

Citando autoridades inglesas, todas en cuanto a que un perdón debe ser alegado, concluyó Marshall que no habiéndose traído el perdón judicialmente ante la corte inferior mediante alegación, moción o en otra forma, el mismo no podía ser de conocimiento de los jueces. En el pronunciamiento enfatizado por mí que se repite una y otra vez en numerosas decisiones, descansa la doctrina, a veces raciocinada de distintas maneras, de que la aceptación del perdón constituye un elemento intrínseco del mismo necesario para su validez y efecto legal, si bien es curioso notar que el caso de *Wilson* no presentaba, ni de hecho se resolvió en él semejante proposición. Como cuestión de realidad en ese caso el perdón se había aceptado. Tampoco

dicha contención se presentó o fue resuelta, en esos términos, en el caso de *Callicot*.

Fue en *Burdick* v. *United States*, supra, (1915) donde efectivamente se decidió en términos inequívocos como una proposición de derecho que un perdón no aceptado, aun cuando fuera incondicional y absoluto, carece de validez y no produce efecto legal alguno. El Tribunal descansó enteramente en el pronunciamiento de Marshall,—el acto particular del ejecutivo que requiere la entrega y aceptación del perdón,—si bien se expandió el concepto de la aceptación más allá de lo que surge del propio pronunciamiento. (²)

Doce años después, en 1927, se resolvió el caso de *Biddle* v. *Perovich*, supra, en donde se había conmutado por el Presidente una pena capital por otra de reclusión perpetua. (³) Exponiendo la contención del Procurador General de que en ningún caso la aceptación de un perdón incondicional era necesaria y que nunca se había considerado necesaria antes de *Burdick;* que los casos ingleses giraban en torno a la necesidad

---

(¹) Posiblemente los hechos de este caso dan la explicación. Burdick era un director de un periódico que se negó a declarar ante el gran jurado en cuanto a las fuentes de información de artículos publicados en relación con fraudes de aduana que el gran jurado investigaba, alegando que su declaración podría incriminarlo. Citado en una segunda ocasión se le entregó un perdón que le habían obtenido del Presidente Wilson. El documento exponía como hechos que Burdick se había negado a declarar por el fundamento de que se incriminaría; que el Fiscal de Distrito deseaba usar el testimonio de Burdick con el fin de determinar si algún empleado del Departamento de Tesorería en la aduana había estado revelando información obtenida en su capacidad oficial, y en la creencia de que Burdick volvería a negarse a declarar a base de incriminación, el Presidente le concedía un perdón incondicional y completo por todos los delitos contra los Estados Unidos que Burdick hubiera cometido o pudiera haber cometido en relación con dichos artículos, y con cualquier otro artículo o asunto sobre el cual fuera interrogado, absolviéndolo de las consecuencias de tales delitos. Burdick se negó a aceptar el perdón y a declarar, insistiendo en que se incriminaría. Fue castigado por desacato y recluido hasta que se decidiera a prestar su declaración. Los motivos detrás de este perdón y las demás circunstancias en torno a este caso explican tal vez ciertos razonamientos del Juez McKenna (236 U. S. pág. 90).

(³) La facultad del Presidente para conmutar sentencias cae bajo el poder general de conceder perdones. Distinto, por ejemplo a la nuestra, la Constitución federal no concede esa facultad por separado.

de que el perdón se alegara, pero que cuando se traía al conocimiento de la Corte "y aún así el acusado alegaba inocencia y renunciaba al perdón, no sería colgado", (cita inglesa de *Jenkins*, 129, Third Century, Case 62), expresó el Juez Holmes hablando por un Tribunal unánime:

"No nos iremos a la historia, pero diremos una palabra acerca del principio de los perdones en la ley de los Estados Unidos. Un perdón en nuestros días no es un acto de gracia particular proveniente de un individuo que resulta poseer poder. Es parte del designio constitucional. Cuando se concede, es la determinación de la autoridad final de que el bien público queda mejor servido infligiendo menos de lo que la sentencia fijó. (Cita.) De la misma manera que el castigo original sería impuesto sin consideración al consentimiento del prisionero y a despecho de su voluntad, le hubiera a él gustado o no, el bienestar público, no su consentimiento, determina lo que deberá hacerse."

Preferiría creer más bien, junto al Juez Holmes, que el poder de gracia ejecutiva de nuestro Primer Magistrado es función de la soberanía del pueblo confiada a él, bajo la estructuración constitucional que adoptamos, como una prerrogativa de su alto cargo que ejerce sin dictados extraños de clase alguna; y cuando la ha ejercido, lleva la determinación, según apunta Holmes, de que el interés público ha sido así mejor servido. *Constitución*, Artículo I, Secciones 1, 2; Artículo IV, Sección 4. Siendo una función del poder público en interés general la que lleva a cabo el Ejecutivo bajo el plan constitucional y no su particular gestión, me inclino a creer que debería estar fuera de toda consideración la aceptación o no de un indulto absoluto, que no impone condición alguna a aceptar o a ser cumplida por el indultado a cambio del mismo, como requisito de su validez y efecto legal.

Pero aún queda un punto, acaso el más sensible. Sostiene la peticionaria, siguiendo una línea de autoridades, que el indulto no borra la culpabilidad, que el aceptarlo voluntariamente implica la aceptación de una culpa que ella rechaza, y que en esas circunstancias imponérselo contra su voluntad es

coaccionar su conciencia. Las decisiones demuestran que, aparte de la descripción de Marshall, ésta ha sido prácticamente la otra consideración detrás de la teoría de la aceptación del indulto aun cuando fuere incondicional, para el efecto del mismo. Se ha dicho que imponer un perdón obligaría a la persona a aceptar una culpabilidad aun cuando fuera inocente. Como expresó el Tribunal Supremo en el caso de *Burdick*, supra, "Las circunstancias pueden ser que se traiga la inocencia bajo las penalidades de la ley. Si así se trajere, el librarse reconociendo la culpa implícita en la aceptación de un perdón puede ser rehusado,—prefiriendo ser la víctima de la ley antes que su admitido violador,—prefiriendo la muerte aun a una tal evidente ignominia. Este, al menos teóricamente, es un derecho y un derecho con frecuencia se prueba mejor en sus extremos. 'Puede suponerse', dijo la corte en *United States* v. *Wilson* (pág. 161), 'que ningún ser condenado a muerte rechazaría un perdón; pero la norma debe ser la misma en casos capitales y en menos graves.' "

Existen dos líneas de autoridades en abierto conflicto, las que sostienen que el perdón sólo alcanza el castigo, librando al indultado del cumplimiento de la sentencia y de los efectos legales de la misma, y otras sosteniendo que también alcanza la culpabilidad borrando todo vestigio de la comisión de un delito. En *Emanuelli* v. *Tribunal de Distrito*, 74 D.P.R. 541, 548, nos pronunciamos a tono con una de esas líneas de criterio y dijimos:

"El indulto borra para siempre la convicción del delito cometido, quedando de ahí en adelante el indultado tan limpio de ella como si nunca hubiera sido convicto."

Véase: *Downs* v. *Porrata*, 76 D.P.R. 611. A tenor con el concepto que tengo de la función de la gracia ejecutiva bajo nuestra Constitución, que no requeriría la aceptación de un perdón total sin condiciones, me adhiero igualmente al anterior pronunciamiento que a mi juicio debe continuar siendo la norma en esta jurisdicción como lo es en muchas otras. Cf: *Com-*

*monwealth* v. *Cain* (Pa.), 28 A.2d 897, *Diehl* v. *Rodgers* (Pa.), 32 Atl. 424; *Marsh* v. *Garwood* (Fla.), 65 So.2d 15; *Taran* v. *United States*, (C. A. 8) 266 F.2d 561; *People* v. *Hardwick* (Cal.), 269 Pac. 427; *State* v. *Swenson* (Md.) 76 A.2d 150; *Ex parte Anderson* (Oregon), 229 P.2d 633; *Ex parte Garland*, 71 U. S. 4 Wall, 333; *In re Ringnalda*, 48 F. Supp. (Cal.) 975; *United States* v. *Palermo*, (C. A. 2) 17 F.2d 534; *In re Stephenson* (Ala.), 10 So.2d 1.

Teniendo el indulto absoluto otorgado en este caso la consecuencia de borrar la convicción de la peticionaria, y su culpabilidad, desaparece la razón del otro fundamento que haría necesaria su aceptación, así como el problema sensitivo de conciencia que ella levanta.

Por todo lo anteriormente expuesto, entiendo que el indulto fue válido y surtió todo su efecto legal tan pronto se notificó, y adviniendo la peticionaria a una libertad plena e irrevocable en virtud del efecto que en derecho tuvo dicho indulto, no es necesario, como dije antes, que dictemos una sentencia que nunca podría concederle una libertad mayor.